UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x
NATHAN PAM, RAZIEL PAM, NEEMAH PAM FISHER,    :
PAULINE RUTH BEN MEIR, JOEL MOSKOWITZ,        :
LEEBA NAAVA BEN MEIR ROTEM, YISRAEL ELDAD     :
BEN MEIR, SHIRIA BEN MEIR, SARA BEN MEIR SHUSHAN,:
MAYA BEN MEIR, MOSHE GABRIEL BEN MEIR,        :
EPHRIAM BLUTH, INDIVIDUALLY AND AS THE LEGAL  : Civil Action No. 18-CV-4670
REPRESENTATIVE OF SHOSHANA BLUTH, TSIPORA     :
BATYA BLUTH REICHER, ISAAC MENACHEM, YIGAL    :
AMICHAI BLUTH, ARIEH YEHUDA BLUTH, CHANINA    :
SAMUEL BLUTH, ABRAHAM AHARON BLUTH, JOSEPH    :
SHIMSHON BLUTH, ZVI FENICEL, ELIEZER SPITZ,   :
INDIVIDUALLY AND AS THE LEGAL REPRESENTATIVE  :
OF SHOSHANA SPITZ, AVITAL SPITZ, YOEL SPITZ,  :
RACHEL SPITZ MENDELSON, TEHILA SPITZ TANNIN,  :
NURIT SPITZ TRAU, CHANA SPITZ WINKLER, BARUCH :
TRATNER, JUDITH TRATNER, DRORA WIZNER, RIVKA  :
SELZER, AND BELKA GEZ.                        :
                                              :
                Plaintiffs,                   :
                                              :
        -against-                             :
                                              :
ARAB BANK, PLC,                               :
                                              :
                Defendant.                    :
-------------------------------------------------------------------------------x

      Plaintiffs Nathan Pam, Raziel Pam, Neemah Pam Fisher, Pauline Ruth Ben Meir, Joel

Moskowitz, Leeba Naava Ben Meir Rotem, Yisrael Eldad Ben Meir, Shiria Ben Meir, Sara Ben

Meir Shushan, Maya Ben Meir, Moshe Gabriel Ben Meir, Ephriam Bluth, individually and as the

Legal Representative of Shoshana Bluth, Tsipora Batya Bluth Reicher, Isaac Menachem Bluth,

Yigal Amichai Bluth, Aryeh Yehuda Bluth, Chanina Samuel Bluth, Abraham Aharon Bluth,

Joseph Shimshon Bluth, Zvi Fenicel, Eliezer Spitz, individually and as the Legal Representative

of Shoshana Spitz, Avital Spitz, Yoel Spitz, Rachel Spitz Mendelson, Tehila Spitz-Tannin, Nurit

Spitz Trau, Chana Spitz Winkler, Baruch Tratner, Judith Tratner, Drora Wizner, Rivka Selzer, and Belka Gez (collectively, "Plaintiffs"), by their attorneys, allege the following upon information and belief, except those allegations that relate to Plaintiffs' biographical information and conduct, which Plaintiffs base upon their personal knowledge.

## NATURE OF ACTION

1. This is a complaint for damages arising out of the unlawful conduct of Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a federal agency[1] in the State of New York. Arab Bank knowingly provided, distributed, and administered financial benefits, money and financial services to: (a) terrorists who killed, injured and maimed civilians, or attempted to do so; (b) the families and beneficiaries of such terrorists to induce those terrorists to act; and (c) Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) in order to facilitate acts of international terrorism, as defined by 18 U.S.C. § 2331.

2. By these acts, Defendant Arab Bank aided and abetted said acts of international terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel between September 2000 and December 2004 during the Second Intifada,[2] including the Plaintiffs' family members. Arab Bank's conduct violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act ("ATA"), as amended by the AEDPA (see, e.g., 18 U.S.C. §§ 2339A and 2339B). As a result, Arab Bank is

---

[1] Until 2005, Arab Bank operated a wholly-owned branch in New York that provided correspondent banking services to other Arab Bank branches located around the world, including branches in the West Bank and the Gaza Strip (collectively, the "Palestinian Territories").

[2] The Second Intifada refers to the violent conflict that broke out in September 2000 between Palestinians and Israel. It is generally considered to have ended in December 2004.

civilly liable under § 2333 of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, which provide for jurisdiction over civil actions brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3).

5.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because: (a) it has transacted business and committed tortious acts within the United States and this District by transferring funds through the United States and this District for the benefit and material aid of the Foreign Terrorist Organization ("FTO") Islamic Resistance Movement ("HAMAS") and other terrorist organizations; (b) it has purposefully availed itself of the laws of the United States and New York in the course of committing the wrongful acts alleged herein; and (c) it resides in this District and committed the wrongful conduct that Plaintiffs allege through agents located in this District.

## THE PARTIES

## I.      The Plaintiffs

## The Pam Family

6.      On June 11, 2003, 16-year-old Rivka Reena Pam was on Bus No. 14A in Jerusalem, Israel.  Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded

Egged Bus No. 14A at the Mahane Yehuda market.  A short while later, as the bus drove down Jaffa Road, within Jerusalem, Israel, he detonated his bomb, wrecking the bus and killing sixteen passengers.   Over 100 people were wounded, including dozens of passersby.

7.      HAMAS claimed responsibility for the bombing.  The suicide bomber who acted for HAMAS to commit this brutal attack was Abed Al Mo'ti Mohammad Shabana.  He carried a huge bomb containing a great deal of metal fragments that caused massive injuries.

8.      This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

9.      Rivka works with children and this teenager's life has changed dramatically as a result of her injuries in this terrorist incident.  She was hospitalized for a number of days in intensive care, suffered burns, lung damage, eye injury, scarring and severe hearing loss, which requires future medical and surgical care.  Her happy outgoing personality has been affected because of the severe emotional distress and hearing loss, pain, suffering, mental anguish, trauma and extreme emotional distress that she has experienced from this terrorist attack, all to her damage.

10.     Rivka Reena Pam was a plaintiff in the action *Litle et al. v. Arab Bank, PLC*, Civil Action No. 1:04-cv-05449-BMC-PK.

11.     Plaintiff Natan Pam is a citizen of the United States and resident of California. He is the brother of Rivka Reena Pam.  As a result of the attack upon his sister, Rivka, Nathan Pam has suffered severe mental anguish and extreme emotional pain and suffering.

12.      Plaintiff Raziel Pam is a citizen of the United States and resident of California. He is the brother of Rivka Reena Pam.  As a result of the attack upon his sister, Rivka, Raziel Pam has suffered severe mental anguish and extreme emotional pain and suffering.

4

13.     Plaintiff Neemah Pam Fisher is a citizen of the United States and a resident of the State of Israel.  She is the sister of Rivka Reena Pam.  As a result of the attack upon her sister, Rivka, Neemah Pam Fisher has suffered severe mental anguish and extreme emotional pain and suffering.

**The Ben Meir Family**

14.     Meshulam Ben Meir is a United States citizen who lives in Ofra, Israel.  On July 30, 2002, he was attacked by a Palestinian suicide bomber who detonated a bomb about five meters away from Ben Meir.  The blast occurred at a falafel stand on Hanevi'im Street in the center of Jerusalem.  Ben Meir was seriously injured along with four others.  He lost all hearing in his left ear and suffered some loss of hearing in his right ear.  He has suffered pain, trauma, mental anguish, extreme emotional distress, medical expenses and other financial losses, all to his damage.

15.     The terrorist who exploded the bomb was Muhssien Attah, a/k/a Hazem Atta Yousef, a/k/a Majd 'Atta, an agent of Al Aqsa Martyrs Brigades ("AAMB").  AAMB claimed responsibility for the explosion.

16.     This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

17.     Meshulam Ben Meir was a plaintiff in the action *Litle, et al. v. Arab Bank, PLC,* Civil Action No. 1:04-cv-05449-BMC-PK.

18.     Plaintiff Pauline Ruth Ben Meir is a citizen of the United States and a resident of the State of Israel.  She is the wife of Meshulam Ben Meir.  As a result of the attack upon her husband, Meshulam, Pauline Ruth Ben Meir has suffered severe mental anguish and extreme emotional pain and suffering.

5

19.     Plaintiff Joel Moskowitz is a citizen of the United States and a resident of New York. He is the brother of Meshulam Ben Meir.  As a result of the attack upon his brother, Meshulam, Joel Moskowitz has suffered severe mental anguish and extreme emotional pain and suffering.

20.     Plaintiff Leeba Naava Ben Meir Rotem is a citizen of the United States and a resident of the State of Israel.  She is the daughter of Meshulam Ben Meir.  As a result of the attack upon her father, Meshulam, Leeba Naava Ben Meir Rotem has suffered severe mental anguish and extreme emotional pain and suffering.

21.     Plaintiff Yisrael Eldad Ben Meir is a citizen of the United States and a resident of the State of Israel.  He is the son of Meshulam Ben Meir.  As a result of the attack upon his father, Meshulam, Yisrael Eldad Ben Meir has suffered severe mental anguish and extreme emotional pain and suffering.

22.     Plaintiff Moshe Gabriel Ben Meir is a citizen of the United States and a resident of California.  He is the son of Meshulam Ben Meir.  As a result of the attack upon his father, Meshulam, Moshe Gabriel Ben Meir has suffered severe mental anguish and extreme emotion pain and suffering.

23.     Plaintiff Shiria Ben Meir is a citizen of the United States and a resident of the State of Israel.  She is the daughter of Meshulam Ben Meir.  As a result of the attack upon her father, Meshulam, Shiria Ben Meir has suffered severe mental anguish and extreme emotional pain and suffering.

24.     Plaintiff Sara Ben Meir Shushan is a citizen of the United States and a resident of the State of Israel.   She is the daughter of Meshulam Ben Meir.  As a result of the attack upon

her father, Meshulam, Sara Ben Meir Shushan has suffered severe mental anguish and extreme emotional pain and suffering.

25.     Plaintiff Maya Ben Meir is a citizen of the United States and a resident of the State of Israel.  She is the daughter of Meshulam Ben Meir.  As a result of the attack upon her father, Meshulam, Maya Ben Meir has suffered severe mental anguish and extreme emotional pain and suffering.

**The Bluth Family**

26.     Nethaniel Bluth is a citizen of the United States who for some time has resided in Israel with his parents, Ephraim and Shoshana.  On March 7, 2002, Nethaniel was a 19-year-old student at Otzem, a school located in the community of Atzmona, Israel.  Nethaniel began his studies there in August, 2001.

27.     On March 7, 2002, while Nethaniel was studying with about 80 other students in a lesson being led by a rabbi, a small explosion occurred.  Nethaniel and the other students rushed to the window to see what had happened.  A Palestinian terrorist who was in the midst of attacking the students had thrown a grenade into one of the dorm rooms.

28.     It was late at night, around 11:00 p.m., and the students looked in horror as the terrorist opened fire on them with a burst from an automatic weapon.  The attacker threw additional grenades in an attempt to kill and injure as many of the students as possible. Nethaniel was struck by shrapnel when a grenade exploded only a few feet from him.  His arms, legs and scalp were injured.  One piece of shrapnel pierced his chest and hit his chest bone.  He suffered pain, trauma, mental anguish and extreme emotional distress, all to his damage.

29.     HAMAS claimed responsibility for the attack, which was committed by Mohammed Fathi Farahat, a/k/a Mohammed Nadal Farhath, a HAMAS agent.

7

30.     This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

31.     Nethaniel was rushed to Tel HaShomer Hospital for surgery to save his life.  Five of his classmates were murdered in the attack.

32.     Nethaniel underwent three surgical procedures following the attack.  His chest wound was closed, a gash in his scalp was surgically treated and the various wounds to his arms were stitched.  Nethaniel has scars from these injuries.

33.     After rehabilitation, Nethaniel regained most of the use of his hands, arms and legs.  He also suffered severe damage to both of his ear drums when the grenade exploded close to him.  His hearing is permanently impaired in his left ear.

*34.*     Nethaniel Bluth was a plaintiff in the action *Litle, et al. v. Arab Bank, PLC,* Civil Action No. 1:04-cv-05449-BMC-PK.

35.     Plaintiff Ephriam Bluth is a citizen of the United States and a resident of the State of Israel.  He is the father of Nethaniel Bluth.  As a result of the attack upon his son, Nethaniel, Ephriam Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

36.     Plaintiff Ephriam Bluth is the sole Legal Heir of Shoshana Bluth.  Shoshana Bluth was the mother of Nethaniel Bluth.  As a result of the attack upon her son, Nethaniel, Shoshana Bluth suffered severe mental anguish and extreme emotional pain and suffering prior to her death.

37.     Plaintiff Tsipora Batya Bluth Reicher is a citizen of the United States and a resident of the State of Israel. She is the sister of Nethaniel Bluth.  As a result of the attack upon her brother, Nethaniel, Tsipora Batya Bluth Reicher has suffered severe mental anguish and extreme emotional pain and suffering.

8

38.     Plaintiff Isaac Menachem Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Isaac Menachem Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

39.     Plaintiff Yigal Amichai Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Yigal Amichai Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

40.     Plaintiff Aryeh Yehuda Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Aryeh Yehuda Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

41.     Plaintiff Chanina Samuel Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother Nethaniel, Chanina Samuel Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

42.     Plaintiff Abraham Aharon Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Natheniel Bluth.  As a result of the attack upon his brother, Nethaniel, Abraham Aharon Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

43.     Plaintiff Joseph Shimshon Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his

brother, Joseph, Shimshon Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

**Zvi Fenichel**

44.     Netanel and Ilanit Fenichel were seated in their parents' automobile on March 31, 2002, when a suicide bomber detonated his explosives while their mother was driving past the local supermarket and medical center.

45.     This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

46.     Shrapnel from the blast pierced the roof of the Fenichels' family car and fractured the top of Netanel's skull, seriously injuring him and injuring his sister, Ilanit.  Netanel was rushed to the nearby medical center and was quickly operated on at Hadassah Hospital in Jerusalem.  He has a permanent hole in the top of his skull.  As a result of the attack, Netanel and Ilanit Fenichel suffered severe physical pain, mental anguish and extreme emotional distress, all to their damage.

47.     The AAMB claimed responsibility for the terror attack, which also wounded four paramedics from the nearby medical center.  The suicide bomber was Jamil Khalaf Hamied.

48.     Netanel Fenichel and Ilanit Fenichel were plaintiffs in the action *Litle, et al. v. Arab Bank, PLC*, Civil Action No. 1:04-cv-05449-BMC-PK.

49.     Plaintiff Zvi Fenichel is a citizen of the United States and a resident of the State of Israel.  He is the brother of Netanel Fenichel and Ilanit Fenichel.  As a result of the attack upon his brother, Netanel, and sister, Ilanit, Zvi Fenichel has suffered severe mental anguish and extreme emotional pain and suffering.

10

**The Spitz Family**

50.     Michael Spitz is a citizen of the United States.  On September 22, 2004, Michael Spitz was injured in a Palestinian terrorist attack near the French Hill section of Jerusalem, Israel when a female terrorist blew herself up, killing 2 border patrol policemen and wounding 17 people waiting at a bus stop nearby.  Michael's ears were damaged from the blast, and he continues to suffer pain, trauma, mental anguish, and extreme emotional distress from the attack, all to his damage.

51.     AAMB claimed responsibility for the terror attack, which was committed by Zaynab Ali Abu Salem.

52.     This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

53.     Michael Spitz was a plaintiff in the action *Litle, et al. v. Arab Bank, PLC*, Civil Action No. 1:04-cv-05449-BMC-PK.

54.     Plaintiff Eliezer Spitz is a citizen of the United States and a resident of the State of Israel.  He is the father of Michael Spitz.  As a result of the attack upon his son, Michael, Eliezer Spitz has suffered severe mental anguish and extreme emotional pain and suffering.

55.     Plaintiff Eliezer Spitz is the sole legal heir and lawful legal representative of Shoshana Spitz.  Shoshana Spitz was the mother of Michael Spitz.  As a result of the attack upon her son, Michael, Shoshana Spitz suffered severe mental anguish and extreme emotional pain and suffering prior to her death.

56.     Plaintiff Avital Spitz is a resident of the State of Israel.  She is the wife of Michael Spitz.  As a result of the attack upon her husband, Michael, Avital Spitz has suffered severe mental anguish and extreme emotional pain and suffering.

57.     Plaintiff Yoel Spitz is a citizen of the United States and a resident of the State of Israel.  He is the brother of Michael Spitz.  As a result of the attack upon his brother, Michael, Yoel Spitz has suffered severe mental anguish and extreme emotional pain and suffering.

58.     Plaintiff Rachel Spitz Mendelson is a citizen of the United States and a resident of the State of Israel.  She is the sister of Michael Spitz.  As a result of the attack upon her brother, Michael, Rachel Spitz Mendelson has suffered severe mental anguish and extreme emotional pain and suffering.

59.     Plaintiff Tehila Spitz Tannin is a citizen of the United States and a resident of the State of Israel.  She is the sister of Michael Spitz.  As a result of the attack upon her brother, Michael, Tehila Spitz Tannin has suffered severe mental anguish and extreme emotional pain and suffering.

60.     Plaintiff Nurit Spitz Trau is a citizen of the United States and a resident of the State of Israel.  She is the sister of Michael Spitz.  As a result of the attack upon her brother, Michael, Nurit Spitz Trau has suffered severe mental anguish and extreme emotional pain and suffering.

61.     Plaintiff Chanina Samuel Bluth is a citizen of the United States and a resident of the State of Israel.  She is the sister of Michael Spitz.  As a result of the attack upon her brother, Michael, Chanina Samuel Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

62.     Plaintiff Chana Spitz Winkler is a citizen of the United States and a resident of the State of Israel.  She is the sister of Michael Spitz.  As a result of the attack upon her brother, Michael, Chana Spitz Winkler has suffered severe mental anguish and extreme emotional pain and suffering.

**The Tratner Family**

63.     On September 24, 2004, Tiferet Tratner, a 24-year-old American citizen who worked with the elderly and with people with disabilities, was killed in her home as she sat on the couch in Neve Dekalim, Israel by a terrorist mortar attack launched from or near the Gaza Strip. This murder took place the day before Yom Kippur.  The Estate of Tiferet Tratner was a plaintiff in the action *Litle, et al. v. Arab Bank, PLC*, Civil Action No. 1:04-cv-05449-BMC-PK.

64.     HAMAS claimed responsibility for the terror attack and was in fact responsible.

65.     This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

66.     Plaintiff Baruch Tratner is a citizen of the United States and a resident of the State of Israel.  He is the brother of Tiferet Tratner.  As a result of the attack upon his sister, Tiferet, Baruch Tratner has suffered severe mental anguish and extreme emotional pain and suffering.

67.     Plaintiff Judith Tratner is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Judith Tratner has suffered severe mental anguish and extreme emotional pain and suffering.

68.     Plaintiff Drora Wizner is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Drora Wizner has suffered severe mental anguish and extreme emotional pain and suffering.

69.     Plaintiff Rivka Selzer is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Rivka Selzer has suffered severe mental anguish and extreme emotional pain and suffering.

70.     Plaintiff Belka Gez is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Belka Gez has suffered severe mental anguish and extreme emotional pain and suffering.

## II.     **The Defendant**

71.     Defendant Arab Bank is a Jordanian bank headquartered in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority ("PA") controlled territories.  Until 2005, Arab Bank operated a wholly-owned branch office located at 520 Madison Avenue, New York, New York.  At all times relevant to this lawsuit, that branch was regulated by the Controller of the Currency of the United States Department of the Treasury.

72.     Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York.

73.     Arab Bank operated its federally chartered branch in New York between 1983 and 2005.  The New York branch was designated as a wholesale bank.  The banking and financial services that it conducted in New York included providing clearing and correspondent bank services to other foreign banks, Arab Bank foreign bank branch offices, and affiliated banking institutions owned and/or controlled by the Arab Bank Group.

74.     In 2005, Arab Bank's New York branch was converted to a federal agency following an investigation by the United States Office of the Comptroller of the Currency and the Financial Crimes Enforcement Network.

75.     Arab Bank and Arab Bank Group were majority owned and/or controlled by members of the Shoman family.  Abdul Majeed A.H. Shoman served as the Chairman of Arab

Bank and Arab Bank Group until his death in 2005. Abdel Hamid A.M. Shoman succeeded his father as Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group upon the latter's death, and remained in those positions until his resignation in 2012.

76.     Abdel Hamid A.M. Shoman was succeeded by Arab Bank's current Chairman, Sabih al-Masri, who was previously Arab Bank's Deputy Chairman.

77.     In 2017, Mr. al-Masri led a group of Jordanian and Arab investors in buying the approximately 20% stake of Arab Bank held by Oger Middle East Holding Company, which is owned by the Lebanese Hariri family.

## FACTUAL ALLEGATIONS

### The Second Intifada

78.     Following the collapse of peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terrorist organizations launched a broad-based terror campaign against the State of Israel that commenced at the end of September 2000 and continued through December 2004. Plaintiffs refer to that terror campaign as the Second Intifada.

79.     During this period, numerous Palestinian terrorists attempted approximately 23,000 attacks, which caused more than 8,000 casualties and over 1,000 civilian deaths.

80.     These acts of violence resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

81.     The preferred method of mass murder used by Palestinian terrorist groups was suicide bombing, which involved an individual carrying an explosive device which he or she detonated in a bus, restaurant or other crowded public gathering place.

15

82.     The device was typically packed with nails, bolts and ball bearings, which, when detonated, lodged themselves deep within the bodies of those unfortunate individuals who happened to be inside the blast radius, causing cruel and horrific injuries.

83.     The objectives of the Second Intifada terror campaign included: (a) intimidating and coercing the civilian population of Israel; (b) attempting to influence the policy of the Israeli Government by compelling Israel to withdraw from territory it presently controls; (c) intimidating and coercing the civilian population of the United States; and (d) attempting to influence the policy of the United States by compelling the United States to withdraw its support from Israel.

**Arab Bank's Longstanding Commitment to Supporting Palestinian Terrorism**

**A.   The Shoman Family**

84.     In 1984, the Shoman family published a biography of Mr. Abdulhameed Shoman (the Bank's founder) entitled *The Indomitable Arab*, in which he consistently set forth his antipathy toward Jews, Zionists and the State of Israel.  He also clearly described his abhorrence for the United States, which he claimed to have once admired until it supported Israel.

85.     Prior to the establishment of Arab Bank, Mr. Shoman had described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.  In his biography, he is quoted as saying that "…within a few years Zionism will have grown strong enough to control the entire economy.  I believe that all business dealings with the Jews – buying, selling or banking transactions – are damaging to our country's best interests."

16

86.     Mr. Shoman's antipathy toward Jews, Zionists and the State of Israel is also

reflected in Arab Bank's Annual Reports.  For example, in Arab Bank's 1968 Annual Report,

Mr. Shoman wrote in his letter to shareholders:

> Nothing would have pleased me more than to be able to refer to the liberation of
> the enemy-occupied territories of our Arab homeland.  But unfortunately, the
> Zionists still occupy the whole of our beloved Palestine as well as Sinai and the
> Golan Heights; and our Moslem and Christian holy places continue to suffer from
> enemy occupation.  Moreover, the expansionist policy of the Zionists has been
> unmasked and the Arabs now know that the Zionist danger threatens not only the
> occupied territories but the entire Arab world.  The only course open to the Arabs,
> therefore, is to concert their efforts throughout the area extending from the
> Atlantic Ocean in the west to the Arabian Gulf in the east, and to sacrifice the
> lives and offer the money needed for their self-defense and for the liberation of
> their sacred places and all their occupied territories.

87.     In his final speech before four hundred employees of Arab Bank, Mr. Shoman

also explained that his hatred for Americans had developed over the years:

> I liked the Americans.  I once bore their nationality, and gathered my fortune in
> their country.  But since they started to help the Zionists and supply them with
> arms to fight us, I have come to detest them.  It was not the Jews, but the
> Americans, who fought us.

88.     Mr. Shoman's son, Abdul Majeed Shoman, succeeded him as the chairman of

Arab Bank.

89.     Abdul Majeed Shoman was the chairman of the Popular Committee in Support of

the Palestinian Intifada, which was established during the First Intifada[3], in 1987-1988.  During

the First Intifada, the Popular Committee  managed  to  raise  approximately  eight  million

Jordanian  Dinar  (JOD8,000,000), or approximately $11,000,000, for "martyrs' families."  The

_____

[3] The First Intifada refers to the violent conflict that broke out in December 1987 between
Palestinians and Israel.  It is generally considered to have ended with the signing of the Oslo
Accords in 1993.

Popular Committee paid 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence.  From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the families of the First Intifada's "martyrs."

90.     Arab Bank's support and commitment to the violent goals of various Palestinian terrorist organizations during the Second Intifada were consistent with the personal views of its chairman, Abdul Majeed Shoman, who was a vocal supporter of the Second Intifada.

91.     At an October 2000 meeting, Abdul Majeed Shoman and other members of the Popular Committee discussed the need for a new mechanism to distribute donations to martyrs' families and the injured of the Second Intifada.

92.     The Popular Committee decided to provide financial support to the martyrs' families on the same terms provided during the First Intifada and to call upon the Jordanian government to make the donations tax-exempt.  Abdul Majeed Shoman, Chairman of Arab Bank at the time, opened the meeting by saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it.  There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman].  The Welfare Association received donations and it has funds.  I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada].  In spite of the fact that donations were collected and are available, nothing was transferred to anybody.  It is our duty to act, and therefore I summoned this meeting to hear from you.

93.     Mr. Shoman objected to locating the Popular Committee's office in Arab Bank's Amman headquarters building, but he left open the possibility of "loaning" an accountant to the Committee.

94.     Ultimately, it was decided that the Popular Committee's office would be located in the Amman Chamber of Industry headquarters, in Amman, Jordan, where it in fact opened on November 1, 2000.

95.     As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada.  Its employees donated 5% of their October salaries to the Palestinian cause.

96.     On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, then chairman of the Palestinian Liberation Organization ("PLO").  The participants in that meeting agreed to form a new entity, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Second Intifada.

97.     Defendant Arab Bank pledged $2,000,000.00 to that new entity.

98.     Mr. Shoman personally pledged $500,000.00.

99.     The Shoman family's donations toward the Second Intifada continued in June 2001, when the Cultural Center of the Abdul Hameed Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada."  The stated purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada [*i.e.*, the Second Intifada]."  The exhibit featured presentations of the martyrs' personal belongings, such as clothing and "tools" they used, along with a description of their lives and deeds until the day of their "martyrdom."

100.    Mr. Shoman's support for the Second Intifada was also reflected in his letters to shareholders contained within Arab Bank's Annual Reports.  For example, in his 2003 letter to shareholders, Mr. Shoman wrote, "Throughout 2003 our branches in the Arab countries were affected by many negative pressure factors, first and foremost the enduring difficult situation

which our brothers in Palestine suffer from and by the occupying enemy's enduring obstinacy and oppression…."

101.     Accordingly, Arab Bank's financial and ideological support for the Second Intifada are a matter of public record.

**B.   The Saudi Committee in Support of the Second Intifada**

102.     On or about October 16, 2000, the Saudi Committee in Support of the Second Intifada (the "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia.

103.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" (*i.e.,* the Second Intifada) and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

104.     The Saudi Committee was also a member of the Union of Good, HAMAS' global fundraising network, and was listed as a member on the Union of Good's website.

105.     The Union of Good maintained account 002850/811/9 at Arab Bank's Beirut Branch.

106.     The Saudi Committee issued a press release regarding the visit to Saudi Arabia by the head of the Union of Good, Dr. Yousef al-Qaradawi, at the invitation of Prince Nayef Bin Abd al-Aziz Al Sa'ud.

107.     According to the press release, "His Royal Highness approved 28 employment projects that the Union proposed to the Saudi Committee for the Support of the al-Quds Intifada. An initial sum of 1.3 million dollars was allocated as a first allotment and shall be followed by additional allotments and projects that the Union will propose to the Committee in the future."

108.     The Saudi Committee also established a website to promote its activities.

20

109.    The website was later revamped.  At that time, the Saudi Committee sanitized its name on the English language version of the website by removing any reference to the Second Intifada.

110.    However, even the sanitized English version of the website stated that the Committee's activities include: "support of the families of martyrs and wounded, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of Palestinian social institutions and sponsorship of needy families …"

111.    In practice, the Saudi Committee constituted a professional fundraising apparatus intended to subsidize the Second Intifada, *i.e.*, to subsidize and incentivize the Palestinian terror campaign and to bankroll HAMAS and its related front organizations in the Palestinian Territories.  In fact, the Saudi Committee's website listed two well-known HAMAS front organizations, Al Salah Islamic Society in the Gaza Strip and the Islamic Charitable Society of Hebron in the West Bank, as coordinating the Saudi Committee's efforts.  The relevant members of the Saudi Committee and Arab Bank's senior management knew that those two front organizations supported HAMAS' terrorist operations.

112.    The Saudi Committee helped bankroll HAMAS-controlled front organizations in the Palestinian Territories by providing these organizations with more than $15,000,000 during the Second Intifada.  The biggest recipients of Saudi Committee funds were the two organizations that coordinated the Saudi Committee's efforts in the Palestinian Territories: the Al Salah Islamic Society received over $9,700,000, and the Islamic Charitable Society of Hebron received just over $4,800,000.  Smaller amounts were received by other well-known HAMAS organizations in the West Bank and Gaza Strip such as Al Mujama Al Islami (The Islamic Center

21

– Gaza), Al Jam'iya Al-Islamiya (The Islamic Society – Gaza) and Al-Tadamun Charitable Society.

113.    These funds were transferred to the organizations via the accounts they maintained at Arab Bank.  Hence, Arab Bank played a key role in the efforts of the Saudi Committee to help bankroll HAMAS and its front organizations.

114.    The Saudi Committee's other goal was accomplished by providing a comprehensive insurance benefit or "martyr" payment of approximately $5,316 to the families of Palestinian terrorists.  The recipients of those "martyr" payments included the HAMAS suicide bombers Nabil Halabiya and Osama Baher, who carried out the deadly double suicide bombing at the Ben Yehuda pedestrian mall in Jerusalem on December 1, 2001 in which U.S. citizen Netanel Miller, a plaintiff in *Litle, et al. v. Arab Bank, PLC*, Civil Action No. 1:04-cv-05449-BMC-PK, was injured.

115.    Other beneficiaries of martyr payments included: (a) the family of Sadeq Ahed Abd el-Hafez, who carried out the Karnei Shomron Pizzeria Bombing on February 16, 2002; and (b) the mother of Wafa' Ali Khalil Idris, who carried out the suicide bombing on Jaffa Road in Jerusalem on January 27, 2002.

116.    Terrorists who were injured by Israeli security forces received a payment of approximately $1,325 from the Saudi Committee.

117.    Terrorists who were captured as a result of their criminal conduct received a payment of approximately $2,655.

118.    These payments, which were sizable by the depressed economic standards of the Palestinian Territories, were widely publicized, which generated great enthusiasm for terrorist attacks by jobless young men, the classic terrorist foot soldiers.

119.    During the Second Intifada, the Saudi Committee paid a total of approximately

$35 million as benefits to: (a) the families of so-called "martyrs," *i.e.*, suicide bombers and

individuals killed by Israeli forces during the commission or attempted commission of terrorist

acts; (b) the families of Palestinians wounded during violent confrontations with Israel's security

forces; and (c) Palestinian activists held in Israeli custody.  All of those funds flowed through

Arab Bank branches.  This substantial economic support was critical to HAMAS' efforts to win

the hearts and minds of the Palestinian people and to create an infrastructure solidifying

HAMAS' position within Palestinian society.

120.    Moreover, the Saudi Committee insurance benefit provided universal terrorist

death and dismemberment insurance coverage for terrorists belonging to any non-HAMAS

terrorist organization, or to none at all.  The Saudi Committee scheme thereby incentivized and

rewarded all terrorists in Israel during the Second Intifada and eliminated the potential

distinctions between terrorist groups, between individual (freelance) terrorists and the more

established terrorist cells, and between the secular and radical Islamist terrorist organizations.

121.    Defendant Arab Bank administered the comprehensive terrorist death and

dismemberment insurance scheme by receiving, transmitting and distributing the benefits in

accordance with lists of families of "martyrs" and others eligible for "coverage."

122.    Arab Bank was provided relatively detailed lists by the Saudi Committee and

representatives of the leading HAMAS organizations, including the names of the "martyrs,"

other identifying information, and details concerning the date and manner of the "martyrs'"

deaths.

123.    For example, Arab Bank received a list from the Saudi Committee that contained

over 650 names.  That list instructed Arab Bank to replace another list of transfers with the list of

new beneficiaries. The list specified the name of the "martyr," the date of death, the cause of

death and the name of the beneficiary. Number 610 on the list was Hatem Al-Sheweikeh, who

carried out a terrorist attack on November 4, 2001. The list identifies Al-Sheweikeh's date of

death as November 4, 2001 and the cause of death as "French Hill Operation." The attack that

Al-Sheweikeh carried out on November 4, 2001 occurred in the French Hill section of Jerusalem.

124.    This list also contained the name of HAMAS' Third "Engineer," Ayman Halawa.

"Engineer" is a term HAMAS uses to describe its bomb-makers. According to the list, Ayman

Halawa was killed on October 22, 2001 in a car bombing.

125.    Another list provided to Arab Bank identifies Hamed Abu Hijla as martyr number

sixteen on a "List of Martyrs' Names in the West Bank Sixth Installment." The list identifies his

cause of death as "Martyr Operation." Hamed Abu Hijla was a very active HAMAS operative.

HAMAS' operational terrorist wing, the Izz al-Din al-Qassam Brigades, posted a picture of well-

known HAMAS operatives Sheikh Hamed al-Bitawi, Jamal Mansour and Jamal Salim Damuni

attending Abu Hijla's funeral.

126.    Accordingly, the terrorist death and dismemberment insurance plan paid the

families of suicide bombers, and Arab Bank and its senior management knew this fact.

127.    Arab Bank coordinated with the Saudi Committee and local representatives of

HAMAS to finalize the lists, maintain a database of persons eligible under this universal terrorist

death and dismemberment insurance plan and received the funds for the plan. HAMAS, through

its network of organizations, collected data on its own operatives as well as all other terrorists

killed, injured or placed in Israeli custody and transmitted that information to the Saudi

Committee and Arab Bank.

128.     Arab Bank's central role in this scheme can be seen from an August 2001 letter
sent by Arab National Bank, an Arab Bank affiliate headquartered in Saudi Arabia, on behalf of
the Saudi Committee to Arab Bank.  That letter states, "We would like to provide you with the
names and addresses of the parties that have provided the Saudi Committee in Support of the Al-
Quds Intifada with the names of the transfers' beneficiaries …"  The letter goes on to list Al
Salah Islamic Society and the Islamic Charitable Society of Hebron, two well-known HAMAS
front organizations, as the sources of the beneficiaries' names.

129.     Correspondence that Arab Bank received from the Al Salah Islamic Society
further demonstrates Arab Bank's coordination with local HAMAS representatives.  In a May
2001 letter from the head of Al Salah, Ahmad Al-Kurd, to Muhammad al-Tahan, Arab Bank's
Manager of Operations in the Palestinian Territories during the Second Intifada, Al Salah
requested that certain transfers from the Saudi Committee be stopped and sent back to the Saudi
Committee.

130.     Similarly, in a July 2001 letter from Al Salah to Arab Bank, Al Salah requested
that Arab Bank provide a list of all individuals who had pending transfers from the Saudi
Committee.

131.     Every Palestinian family eligible for a Saudi Committee payment was encouraged
to collect the terrorism benefits through a local branch of Arab Bank in the Palestinian
Territories.

132.     The conspiracy between the Saudi Committee and HAMAS and others was
ultimately designed to provide substantial material support to Palestinian terrorist organizations
and to provide a meaningful incentive both to prospective recruits and to individuals
contemplating the commission of independent acts of violence in the name of the "popular

resistance."  Arab Bank knew that the purpose of the conspiracy and the acts taken pursuant thereto was to encourage Palestinians to engage in terrorist activities, and to support the continued commission of terrorist activities.

133.    Arab Bank was aware of the methods and means by which HAMAS, the Popular Front for the Liberation of Palestine ("PFLP"), and other Foreign Terrorist Organizations sought to carry out their objectives.

134.    Defendant Arab Bank knowingly and substantially assisted in the recruitment of terrorists by serving as the paymaster and accountant for this and other death and dismemberment insurance plans.

135.    Any person who chose to participate in a suicide bombing or other terrorist attack did so secure in the knowledge that, if he or she were killed in that attack, the financial needs of his or her family would be met for some time.

136.    The same is true of the families of terrorists who were injured or apprehended. These payments were quite substantial considering the average earnings of Palestinian workers.

137.    In short, the Saudi Committee raised funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocated payments to Arab Bank to fulfill the Saudi Committee's public pledge to provide universal insurance coverage and incentive payments to Palestinian terrorists and would-be terrorists.

138.    Official U.S. government reports confirmed the role that the Saudi Committee played in funding Palestinian terrorism.  According to a U.S. State Department report, "Saudi Arabia continues to serve as a base for Hamas fundraising, by means of direct Hamas representational presence in the Kingdom of Saudi Arabia and through the possible continuing

operation of the Account 98 system."  Account 98 was the designated account at numerous Saudi

banks for collecting money destined for Palestinian charitable organizations.

139.    According to the State Department Report:

In 2003, the United States provided evidence to Saudi authorities that the Saudi al Quds lntifadah Committee ("Committee") founded in October 2000, was forwarding millions of dollars in funds to the families of Palestinians engaged in terrorist activities, including those of suicide bombers.  The funds were often transferred through integrated accounts at a number of major Saudi banks that were popularly referred to as Account 98.

140.    This system of collecting funds via Account 98 was still in use in 2005.

According to the State Department Report:

In fact, Account 98 appears to still be in operation, as it is widely advertised as a receiving point for contributions to Palestinian organizations.  As of early December 2005, on King Fahd Road, just south of the Ministry of Interior, there is a billboard reminding readers to "remember Jerusalem" (Al Quds) and to make donations to Account 98.  U.S. visitors first observed the billboard in the spring of 2005.

On August 29, 2005, a program aired in Saudi Arabia on lqra TV soliciting funds for the Saudi Committee for the Support of the al Quds Intifadah and asked donors to direct funds to a joint Account 98 at "all banks in the Kingdom of Saudi Arabia."

141.    Through the program administered by Arab Bank, the Saudi Committee paid and

transmitted death benefits to over 1,600 "martyrs" totaling more than $8,500,000.  Between 2000

and 2002, the Saudi Committee paid more than $35,000,000 to the families of Palestinian

"martyrs," "prisoners" and wounded.

142.    According to Arab Bank's Chief Banking Officer, Shukry Bishara, beginning in

December 2001, Arab Bank transmitted over $90,000,000 to "institutions and individuals"

located in the Palestinian Territories on behalf of the Saudi Committee.

143.    In fact, Arab Bank served as the exclusive administrator for the Saudi Committee's payment programs.

144.    Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of "martyrs" through Arab Bank branches located in the Palestinian Territories.  Although the Saudi Committee eventually removed that content from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm set forth that information under the caption: "What has been done with your donations?"

145.    Item number ten on the list responding to that question states, "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

146.    The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

147.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 10, 2001, the Saudi Committee identified payments made to "Martyrs of al-Aqsa Intifada – The West Bank (The Third Group)."  That annual report lists a total of 22 individuals.  For each "martyr," the list identifies, *inter alia*, the name of the "martyr," his or her beneficiary, and their account number at Arab Bank.

148.    Defendant Arab Bank provided a convenient means for transmitting and distributing payments across Palestinian controlled territories.  Distributing those funds would have been far more difficult if attempted by other means, such as courier.  Israeli territory separates Gaza from the West Bank, and Israeli military checkpoints often separate one Palestinian city from another.

149.     Arab Bank knew the criminal purpose that the accounts it opened and maintained for the Saudi Committee were intended to serve.

150.     The Saudi Committee and local HAMAS charitable front organizations publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television, and on the Saudi Committee's website, all of which were known to Arab Bank and all of which were calculated to – and did – reach terrorists and potential terrorists.  For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazira*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits, as well as the names of the Palestinian martyrs (including those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that "the relatives of the martyrs, whose names hereby follow, are requested to head for the Arab Bank branches in their place of residence in order to receive the tenth payment from the Honorable Saudi Committee – a sum of 5,316.06 USD ...."  The listed "martyrs" include Ayman Halawa (*see* ¶ 124), Hatem Al-Sheweikh (*see* ¶ 123), and Mamud Abu Hanud, commander of HAMAS' Izz al-Din al-Qassam Brigades in the West Bank.

151.     Since the Saudi Committee raised its funds in Saudi currency, which could not conveniently be converted into the Israeli currency most commonly used in the Palestinian Territories, those funds were primarily converted into U.S. dollars through Arab Bank's then-operating New York branch.  Arab Bank then routed the U.S. dollars to Arab Bank branches in the Palestinian Territories.  Arab Bank played three essential roles in furthering the currency conversions essential to the Saudi Committee's terror financing scheme.

152.    First, Arab Bank provided both professionalism and transparency to the process, thereby reassuring wealthy Saudi and Gulf State donors that the money they were contributing would not be siphoned off by corrupt officials, but would in fact reach the families of terrorists as intended.

153.    Second, Arab Bank, through its network of local branches in the West Bank and Gaza, provided an ideal distribution system for the families of terrorists and the Saudi Committee's donors.  That distribution system offered convenience to the terrorists' families, who were able to bypass the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier.  In addition, Arab Bank provided an accounting system that minimized the risk of duplicate payments and unreliable record-keeping.

154.    Third, the Arab Bank correspondent banking function in New York allowed the Saudi Committee to obtain large volumes of U.S. dollars for distribution to terrorists and their family members in the Palestinian Territories.  The Saudi Committee could not have obtained those U.S. dollars without Arab Bank's participation in the terrorist funding scheme.  The terrorists or "martyrs" and their families did not want to be paid in Saudi currency.

### Arab Bank's Significant Ties To The Primary Palestinian Terrorist Groups

155.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS.  HAMAS is a primarily radical Islamist terrorist organizations committed to the globalization of Islam through violent "jihad" or holy war.

156.    HAMAS is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism.  The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

30

157.     In addition, the nominal proto-government within Palestinian-controlled territory known as the Palestinian Authority (the "PA") operates several paramilitary organizations through its political organizations, the PLO and Fatah.

158.     Through the PLO's various permutations, including its "security services," the PA (and Fatah) competed with HAMAS to commit terrorist attacks against civilian targets in Israel, including attacks that have killed and injured United States citizens.

159.     The AAMB is one of the more well-known and lethal terror organizations sponsored by and belonging to Fatah.

**A.  The Islamic Resistance Movement ("HAMAS")**

       **(i)     HAMAS' Founding and Structure**

160.     HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement.  HAMAS was founded in December 1987 by Sheikh Ahmed Yassin together with Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

161.     HAMAS is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

162.     HAMAS is nominally divided into three interconnected wings: a political organization, the "Da'wa" (HAMAS' social service or humanitarian component), and a military operational wing known as the Izz-al-Din al-Qassam Brigades.  Although these components have separate responsibilities, the HAMAS organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

163.    HAMAS' social services are, in large part, administered by local "zakat" committees and charitable societies.  HAMAS either established these committees or coopted them by, *inter alia*, installing HAMAS members, operatives and activists as members of the zakat committees' governing bodies.  These committees and organizations collect and distribute funds on behalf of HAMAS for HAMAS purposes.

164.    Al Mujama Al Islami (The Islamic Center – Gaza) and Al Jam'iya Al Islamiya (The Islamic Society – Gaza) were both founded by Sheikh Yassin in the 1970s, prior to the formation of HAMAS.  Following HAMAS's founding, these two organizations formed the backbone of HAMAS' Da'wa.  Arab Bank maintained accounts for both organizations.

165.    The zakat committees played important roles in channeling funds to pay expenses for, and assist the families of, terrorist operatives who were arrested, injured or killed.  These entities also assisted with providing housing subsidies to the families of suicide bombers whose homes were often demolished by the Israeli army after the bombers' identities had been confirmed.

166.    The zakat committees also helped to identify and recruit potential terrorists.

167.    In particular, HAMAS routs significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Even the funds utilized for charitable purposes free up other funds for specific terrorist acts.  HAMAS used (and still uses) funds purportedly collected for charitable purposes to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.  And funds used for HAMAS charitable purposes directly support its military operations, as they support HAMAS' image-making machine, which increases its fundraising and attracts foot soldier recruits.

32

168.     As noted above, HAMAS is a Foreign Terrorist Organization dedicated to radical Islamist principles and the destruction of the State of Israel.  It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

169.     HAMAS knowingly, willfully, and unlawfully combined, conspired, confederated and agreed to commit numerous acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332, including acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations.

### (ii)     HAMAS' Formal Designation As A Terrorist Organization

170.     In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in the official Government of Israel publication, the Announcements and Advertisements Gazette.

171.     On January 23, 1995, President Clinton issued Executive Order No. 12947, which found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

172.     Executive Order No. 12947 designated HAMAS a Specially Designated Terrorist ("SDT") and blocked all of its property and interests in property.

173.      On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996.  The designation of HAMAS as an FTO has been renewed every two years since 1997.

174.    After the September 11, 2001 terrorist attacks on the United States, President

Bush issued Executive Order No. 13224, declaring a national emergency with respect to the

"grave acts of terrorism ... and the continuing and immediate threat of further attacks on United

States nationals or the United States."

175.    Executive Order No. 13224 designated HAMAS a Specially Designated Global

Terrorist ("SDGT").  That Executive Order also blocked all property and interests in property of

SDGTs, including HAMAS.

       **(iii)**    **Arab Bank's Close Connections to HAMAS' Leadership**

          **a.**    **Sheikh Ahmed Yassin**

176.    As noted above, Sheikh Ahmed Yassin founded HAMAS in 1987.  He was also

its spiritual leader and iconic symbol.

177.    During the 1970s, Yassin established Al Mujama Al Islami and Al Jam'iya Al

Islamiya.  These two organizations are central to HAMAS' Da'wa.

178.    On January 25, 1995, Yassin was designated an SDT pursuant to Executive Order

12947.

179.    On August 22, 2003, Yassin was designated an SDGT pursuant to Executive

Order 13224.

180.    Yassin maintained account number 36444 at Arab Bank's Gaza branch.  On May

30, 2001, Yassin received a $60,000 transfer into this account from Yousef El Hayek through

Arab Bank's New York branch.  Yassin's wife, Halima Hasan Yassin, also maintained an

account at Arab Bank and received $153,435 between November 2000 and May 2001 through

Arab Bank's New York branch.

181.    Sheikh Yassin was assassinated by Israel in 2004.

**b.   Salah Shehada**

182.     As noted above, Salah Shehada was one of the founders of HAMAS.

183.     With the founding of HAMAS, Shehada was appointed to head HAMAS'

operations in the northern Gaza Strip.

184.     Shehada was also the founder of HAMAS' operational terrorist wing, the Izz al-

Din al-Qassam Brigades.

185.     Shehada was arrested by Israel in 1988 and released in 2000.  He was killed by

the Israel Defense Forces ("IDF") in July 2002.

186.     Shehada maintained account number 349321510 at Arab Bank's Gaza branch.

Between November 2000 and February 2001, he received 7 transfers totaling $109,500 through

Arab Bank's New York branch.

187.     Shehada's wife also received a Saudi Committee prisoner payment of $2,655.

**c.      Muhammad Sham'a**

188.     As noted above, Muhammad Sham'a was one of the founders of HAMAS.  He

was born in 1937 and was one of the co-founders of Al Mujama Al Islami.

189.      Following the founding of HAMAS, he was put in charge of Shati Refugee

Camp.

190.     Sham'a maintained account number 513636510 at Arab Bank's Gaza branch.

Between January 2001 and December 2001, he received at least four transfers totaling $144,000

through Arab Bank's New York branch.

**d.      Abd al-Fatah Dukhan**

191.     As noted above, Abd al-Fatah Dukhan was one of the founders of HAMAS.

192.    Dukhan was a member of Al Mujama Al Islami and headed its Nusairat Refugee Camp branch.

193.    Following the founding of HAMAS, Dukhan was put in charge of four Palestinian refugee camps.

194.    Dukhan was the beneficiary of a Saudi Committee prisoner payment of $2,655 through Arab Bank's New York branch for his son, who was imprisoned in Israel.

   **e.**  **Ismail Abd al-Salam Haniya**

195.    Ismail Haniya was born in 1962 in the Shati Refugee Camp in Gaza.  In 1981, he joined the Islamic Bloc (Al-Kutla Al-Islamiya), the student affiliate of the Muslim Brotherhood, from which HAMAS emerged.

196.    Haniya served as a member of Al Jam'iya Al Islamiya's senior administrative body and headed its club in Gaza for approximately 10 years.

197.    Haniya became a close aide to Sheikh Yassin.

198.    In 2006, Haniya led the HAMAS "Change and Reform List," which prevailed in elections to govern the Palestinian Authority.  Haniya then became the Prime Minister of the HAMAS government in Gaza.

199.    He is currently the head of HAMAS.

200.    Haniya maintained account number 63517500 at Arab Bank's Gaza branch. Between July 2000 and September 2001, Haniya received 19 transfers totaling $420,100 through Arab Bank's New York branch.

36

### f.   Ismail Abu Shanab

201.    Ismail Abu Shanab was born in 1950 in the Nuseirat Refugee Camp in the Gaza Strip.  He studied engineering at al-Mansura University in Egypt and received a master's degree in engineering from the University of Colorado.

202.    Abu Shanab was one of the founders of the Islamic Society – Gaza.  He was a close aide to Sheikh Yassin, serving as his deputy.

203.    Abu Shanab was killed in an IDF operation on August 21, 2003.

204.    Abu Shanab maintained account number 236519510 at Arab Bank's Gaza branch. Between August 2000 and August 2001, Abu Shanab received 9 transfers totaling $173,172 through Arab Bank's New York branch.

### (iv)   Arab Bank's Prominent Role in Financing HAMAS Terrorism

205.    Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

206.    HAMAS received a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good.  The Union of Good, in turn, raised funds that were, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal, a British charity that was designated an SDGT by the U.S. government in August 2003.

a. **The Union of Good**

207.    I'Tilafu Al-Khayr, a/k/a the Union of Good, was an umbrella organization established by HAMAS' leadership in October 2000, immediately following the outbreak of the Second Intifada.  It comprised more than fifty Islamic charitable foundations worldwide.

208.    The Union of Good was a principal fundraising mechanism for HAMAS.

209.    The Union of Good's primary "charitable" purpose was to provide financial support for HAMAS and its agents in the Palestinian Territories.

210.    The Government of Israel outlawed the Union of Good and one of its member organizations, the World Assembly of Muslim Youth, in February 2002 and furthered outlawed 36 of its member organizations in July 2008.

211.    Three member organizations of the Union of Good – Interpal, Commite de Bienfaisance et de Secours aux Palestiniens ("CBSP") and the Al Aqsa Foundation – were designated as terrorist organizations by the Government of Israel in 1997.

212.     The Al Aqsa Foundation in Germany opened account number 300733-300 at Arab Bank's Frankfurt branch in 1994.  The Al Aqsa Foundation in Germany was closed down by the German Government in 2002.

213.    On May 29, 2003, the United States designated Al Aqsa Foundation an SDGT because of its role as a HAMAS fundraiser.

214.     On August 19, 2003, a HAMAS suicide bomber blew up Egged bus #2 in Jerusalem, killing twenty-three people, including seven children.

215.    On August 22, 2003, pursuant to Executive Order 13224, President Bush linked HAMAS to the Egged bus #2 attack.  The Executive Order identified CBSP and Interpal as

HAMAS fundraising entities, designated them SDGTs, and identified CBSP as the "primary

fundraiser[] for HAMAS in France" and Interpal as "the fundraising coordinator of HAMAS."

216.    Other Union of Good members designated by the U.S. Government as SDGTs

include Association de Secours Palestinian ("ASP") and Palestinian Association in Austria

("PVOE") (both designated on August 22, 2003 with CBSP and Interpal).

217.    The United States Government designated the Union of Good itself an SDGT on

November 12, 2008.  The press release announcing the designation noted:

> The Union of Good acts as a broker for Hamas by facilitating financial transfers
> between a web of charitable organizations—including several organizations
> previously designated under E.O. 13224 for providing support to Hamas—and
> Hamas-controlled organizations in the West Bank and Gaza.  The primary
> purpose of this activity is to strengthen Hamas' political and military position in
> the West Bank and Gaza, including by: (i) diverting charitable donations to
> support Hamas members and the families of terrorist operatives; and (ii)
> dispensing social welfare and other charitable services on behalf of Hamas….
>
> Funds raised by the Union of Good affiliates have been transferred to Hamas-
> managed organizations in the West Bank and Gaza.  In addition to providing
> cover for Hamas financial transfers, some of the funds transferred by the Union of
> Good have compensated Hamas terrorists by providing payments to the families
> of suicide bombers.

218.    The Union of Good used Interpal as its principal clearing house for funds raised

throughout Europe and the Middle East.

219.    The Union of Good's "101 Days Campaign" maintained its own website at

www.101days.org.  The campaign solicited funds for HAMAS and directed prospective donors

to donate via Interpal's bank accounts.

220.    Similarly, CBSP's website solicited funds for the 101 Days Campaign and

provided contact information and bank account information for donations.  Among the

organizations listed on this website were several U.S.-designated SDGTs, including Interpal, CBSP and various branches of the Al Aqsa Foundation.

221.    The Union of Good is headed by Dr. Yousef al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar.  Al-Qaradawi has been on the U.S. State Department's Watch List since November 1999 and cannot travel to the United States.

222.    Al-Qaradawi is well known in the Arab world. He had his own weekly television program on Al Jazeera and has very publicly issued an Islamic religious edict (fatwa) authorizing suicide bombing attacks against Israel.[4]

223.    In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Second Intifada against Israel as a "new type of jihad, financial jihad, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

224.    In an interview with *The Guardian* newspaper in October 2005, al-Qaradawi discussed suicide bombing in Israel and was quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community.  These operations are best seen as the weapon of the weak against the powerful.  It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have – the powerful are not willing to give their lives for any cause.

---

[4] Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the Second Intifada, as cited in HAMAS' official website: http://www.palestineinfo.info/arabic/fatawa/alamaliyat/qaradawi.htm.

225.    During a 2007 broadcast on Al Jazeera, al-Qaradawi sat next to the head of

HAMAS' political wing, Khalid Mishal, a designated SDGT.  During the broadcast, al-Qaradawi

stated:

> I support the Palestinian cause.  I support resistance and jihad.  I support Hamas.
> I support the [Islamic] Jihad group.  I support Hizballah.  I am against the peace
> that Israel and America want to dictate.  This is an illusory peace.  I support
> amaliyat istishhadyia [suicide attacks] and this is the straw [that broke the camel's
> back].  What should I do now?  This big terrorist is sitting next to me and they will
> accuse me because of this today.

226.    During the same conference, Khalid Mishal stated:

> The third point: the Union of Good.  One of the blessings of our Sheikh, may
> Allah reward him, is that he supports what he says with acts.  His support of the
> Palestinian people and the Intifada was not in words, positions and fatwas
> [religious rulings] only, but also in activities and efforts.  He sponsored a big
> project which is the Union of Good during the Second Intifada – the blessed al-
> Aqsa Intifada.  I do not exaggerate when I say that what the projects of Union of
> Good provided - the blessed money from the good people of the [Muslim] nation
> to the steadfast people on the land of Palestine – was tens, even hundreds of
> millions of dollars.  I wish that this will be in the Sheikh's balance of good deeds.

### b.    Interpal

227.    As noted above, charitable donations to the Union of Good are partially collected

and distributed through Interpal.

228.    Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was

reincorporated as Interpal in November 1994.

229.    As noted above, the U.S. Government designated Interpal an SDGT on August

22, 2003.

230.    Between January 1999 and August 22, 2003, Interpal transferred over $8,800,000

to beneficiaries who maintained accounts at Arab Bank.  Between August 23, 2003 and

December 2004, Interpal transferred over $600,000 to beneficiaries who maintained accounts at Arab Bank.

231.    According to testimony during the consolidated liability trial in *Linde v. Arab Bank*, Arab Bank's branch in London maintained an account for Interpal.

### c.    Holy Land Foundation for Relief and Development

232.    The Holy Land Foundation ("HLF"), originally known as the Occupied Land Fund, was founded in the late 1980s in California.  In 1992, it relocated to Richardson, Texas.  During the Second Intifada, HLF maintained representative offices in the West Bank and Gaza.

233.    HLF was HAMAS' primary fundraiser in the United States until it was designated an SDGT in December 2001.

234.    HLF supported HAMAS with money that was delivered to HAMAS-controlled charitable societies in the Palestinian Territories.  For example, between 1989 and 1994, HLF sent more than $730,000 to Al Mujama Al Islami and its director, HAMAS co-founder Ibrahim al-Yazuri.

235.    Arab Bank knowingly laundered funds for HLF for more than a decade.  In particular, Arab Bank channeled tens of thousands of dollars of HLF transfers through the Arab Bank New York branch to the Ramallah Zakat Committee, the Tulkarem Zakat Committee, and the Islamic Charitable Society of Hebron, all agents of HAMAS.

236.    On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations.  The article specifically discussed Israeli Government claims that HLF was a "key fundraising operation" for HAMAS.

237.    On May 6, 1997, the Government of Israel designated HLF an "unlawful association" and declared that HLF "deals in the practice of transferring monies to families of

HAMAS activists, who carried out deadly attacks ...”  The Government of Israel further designated HLF a terrorist organization on January 17, 1998.

238.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations.  HLF's Gaza office was one of the entities (temporarily) closed by the PA.  The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

239.    HLF and its officers have been convicted in the United States District Court for the Northern District of Texas for knowingly providing material support to HAMAS.  The HLF trial highlighted specific payments made by HLF to the Islamic Charitable Society of Hebron, the Ramallah Zakat Committee, the Tulkarem Zakat Committee, the Nablus Zakat Committee, and the Jenin Zakat Committee.

240.    The HLF indictment also highlighted specific violations of 18 U.S.C. § 2339B that the HLF committed by transferring funds to the Ramallah Zakat Committee, the Tulkarem Zakat Committee, and the Islamic Charitable Society of Hebron.

### d.    Hamdan Account

241.    Arab Bank knowingly provided banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut, which collected funds directly in the name of HAMAS.

242.    This account was opened in July 1998 by Osama Hamdan as an individual account.

243.    Osama Hamdan was HAMAS' representative in Lebanon since 1998 and a senior HAMAS leader.

43

244.     Hamdan was not a clandestine figure unknown to the public.  For example, on March 27, 2002, following the bombing of the Park Hotel in Netanya, Israel on Passover, he was interviewed by CNN regarding the bombing.  CNN identified Hamdan as HAMAS' spokesman.

245.     In August 2003, the U.S. Treasury Department designated Hamdan an SDGT due to his leadership position in Hamas.

246.     According to the U.S. Treasury press release announcing the Hamdan designation:

> Hamdan, a senior HAMAS official based in Lebanon, maintains contact with representatives with other terrorist organizations with the purpose of strengthening the ties between these organizations in order to strengthen an international Islamic Jihad.  He has worked with other HAMAS and Hizballah leaders on initiatives to develop and activate the military network inside the Palestinian territories in support of the current intifada, including the movement of weapons, explosives and personnel to the West Bank and Gaza for HAMAS fighters.
>
> Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian "martyrs" have been transferred to the bank account of Hamdan and used to support HAMAS military operations in Israel.

247.     The United States Department of Justice identified the website www.palestine-info.com as the "official" website of HAMAS.[5]

248.     The website solicited funds and asked contributors to send money to the Al-Mazra Branch Account # 3-810-622473-0330 at Arab Bank in Beirut, but it also asked donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

---

[5] The website has since migrated to a new "URL" and can be found at https://www.palinfo.com.

249.    As noted above, this account was opened by Osama Hamdan, not the Palestine Information Center.

250.    During the 2014 civil trial against Arab Bank for attacks perpetrated by HAMAS, three wire transfers to this account were introduced into evidence for which the listed beneficiary was "Harakat al Muqawamah al Islamiyah Hamas."  Additional wire transfers listed the beneficiary as the "Palestine Information Center" – the name given to HAMAS' website.

251.    This account was maintained by Arab Bank until after the *Linde v. Arab Bank* lawsuit was filed in July 2004.

252.    At the end of August 2004, more than a year after Hamdan had been designated an SDGT by the U.S. Government and only after the *Linde* Complaint alleged the foregoing facts concerning the Hamdan account, Arab Bank finally took steps to close the account.

253.    Arab Bank retained the $8,677.92 that was contained in the account until March 30, 2005, at which point it issued a check in that amount to Hamdan, who retrieved the money from the bank.  Arab Bank provided Hamdan with the funds despite knowing that he had been designated by the U.S. government as an SDGT because he was a senior HAMAS official.

**e.    HAMAS-Controlled Persons and Entities in the West Bank and Gaza**

254.    As noted above, HAMAS raises funds to support its terrorist acts through a network of "charitable" front organizations called the Da'wa.

255.    Arab Bank knowingly provided banking services to these zakat committees and charitable committees and affirmatively assisted them in collecting, receiving, transmitting and distributing funds to support the Second Intifada terror campaign.

256.    The numerous front organizations HAMAS established to assist in carrying out its terrorist activities, included:

a.    Al Mujama Al Islami, a/k/a The Islamic Center – Gaza;
b.    Al Jam'iya Al Islamiya, a/k/a The Islamic Society – Gaza;
c.    Al Salah Islamic Society – Gaza;
d.    Islamic Charitable Society of Hebron;
e.    Ramallah Zakat Committee;
f.    Tulkarem Zakat Committee;
g.    Nablus Zakat Committee;
h.    Jenin Zakat Committee;
i.    Al-Tadamun Charitable Society – Nablus; and
j.    Al Islah Charitable Society (collectively, the "Front Organizations").

257.    Arab Bank provided direct financial services, including maintaining bank accounts and conducting wire transfers, for all of the Front Organizations.

258.    Al Mujama Al Islami, Al Jam'iya Al Islamiya, Al-Salah Islamic Society – Gaza, Islamic Charitable Society of Hebron, Tulkarem Zakat Committee, Nablus Zakat Committee, Ramallah Zakat Committee, and Jenin Zakat Committee were all identified by the United States Department of Justice as HAMAS front organizations, and the management of each of these "charities" is in fact controlled by HAMAS operatives.

259.    All of the Front Organizations other than the Nablus Zakat Committee were designated "unlawful organizations" by the Government of Israel in February 2002 because of their connection to HAMAS.

260.    The Nablus Zakat Committee was designated an "unlawful organization" by the Government of Israel in June 2005.

261.    On August 7, 2007, the United States Government designated Al Salah Islamic Society – Gaza and its chairman, Ahmad al-Kurd, SDGTs.

262.    According the U.S. Treasury press release announcing the designation:

One of the most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the Al-Salah Society as "one of the three Islamic charities that form Hamas' welfare arm."  The Al-Salah Society has received

substantial funding from Persian Gulf countries, including at least hundreds of thousands of dollars from Kuwaiti donors….

The Al-Salah Society has employed a number of Hamas military wing members. In late 2002, an official of the Al-Salah Society in Gaza was the principal leader of a Hamas military wing structure in the Al-Maghazi refugee camp in Gaza. The founder and former director of the Al-Salah Society's Al-Maghazi branch reportedly also operated as a member of the Hamas military wing structure in Al-Maghazi, participated in weapons deals, and served as a liaison to the rest of the Hamas structure in Al-Maghazi. At least four other Hamas military wing members in the Al-Maghazi refugee camp in Gaza were tied to the Al-Salah Society.

263.    According to the same press release, "The Al-Salah Society was included on a list of suspected Hamas and Palestinian Islamic Jihad-affiliated [non-governmental organizations] whose accounts were frozen by the Palestinian Authority as of late August 2003. After freezing the bank accounts, PA officials confirmed that the Al-Salah Society was a front for Hamas."

264.    Arab Bank also processed wire transfers totaling more than $100,000 for Abbas al-Sayyed, who was described as "the individual who confessed responsibility for the Park Hotel bombing in 2002."

265.    Arab Bank provided financial services to agents of HAMAS through the following accounts that it maintained in the West Bank and Gaza Strip, unless noted otherwise:

     a. Tulkarem Zakat Committee Account No. 9070-500010-6-500
     b. Tulkarem Zakat Committee Account No. 9070-500010-6-510
     c. Tulkarem Zakat Committee Account No. 9070-500010-0-520
     d. Tulkarem Zakat Committee Account No. 1003-536447-301 (at Arab Bank's Kensington Branch)
     e. Ramallah Zakat Committee Account No. 9030-610686-2-510
     f. Ramallah Zakat Committee Account No. 9030-610686-2-500
     g. Ramallah Zakat Committee Account No. 9030-610686-0-500
     h. Nablus Zakat Committee Account No. 9020-400336-0-500
     i. Nablus Zakat Committee Account No. 9020-400336-5-500
     j. Nablus Zakat Committee Account No. 9020-400336-5-598
     k. Al Mujama Al Islami Account No. 9500-012410-9-510
     l. Charitable Society of Hebron Account No. 9040-750049-0-510
     m. Islamic Charitable Society of Hebron Account No. 9040-750049-1-510

    n.  Al Jam'iya Al Islamiya Account No. 411-546868-1003 (at Arab Bank's Kensington Branch)
    o.  Al Jam'iya Al Islamiya Account No. 3683-8-510
    p.  Al Salah Islamic Society – Gaza Account No. 9500-5600-510
    q.  Al Salah Islamic Society – Gaza Account No. 9500-5600-6
    r.  Jenin Zakat Committee Account No. 543079301
    s.  Jenin Zakat Committee Account No. 1003-225-543087 (at Arab Bank's Kensington Branch)
    t.  Al Islah Charitable Society Account No. 9030-649611-3-510
    u.  Al-Tadamun Charitable Society – Nablus Account No. 400271-7-510

266.    Between 1999 and 2004, Arab Bank processed wire transfers for the following supposed "charities" that operated as HAMAS front organizations:

    a.  Al Mujama Al Islami – at least 31 transfers totaling $799,552, including one transfer that was processed by Arab Bank's New York Branch
    b.  Al Jam'iya Al Islamiya – at least 132 transfers totaling $2,673,467, including 39 transfers that were processed by Arab Bank's New York Branch
    c.  Al Salah Islamic Society – Gaza – at least 147 transfers totaling $15,236,322, including 61 transfers that were processed by Arab Bank's New York Branch
    d.  Islamic Charitable Society of Hebron – at least 177 transfers totaling $9,457,768, including 91 transfers that were processed by Arab Bank's New York Branch
    e.  Jenin Zakat Committee – at least 2 transfers totaling $21,264 that were processed by Arab Bank's New York Branch
    f.  Nablus Zakat Committee – at least 55 transfers totaling $687,100, including 21 transfers that were processed by Arab Bank's New York Branch
    g.  Tulkarem Zakat Committee – at least 64 transfers totaling $704,526, including 22 transfers that were processed by Arab Bank's New York Branch
    h.  Ramallah Zakat Committee – at least 83 transfers totaling 862,815, including 37 transfers that were processed by Arab Bank's New York Branch
    i.  Al Islah Charitable Society – at least 32 transfers totaling $1,168,066, including 15 transfers that were processed by Arab Bank's New York Branch
    j.  Al-Tadamun Charitable Society – Nablus – at least 48 transfers totaling $648,395 including 16 transfers that were processed by Arab Bank's New York Branch.

**B.  The Al Aqsa Martyrs Brigade ("AAMB")**

267.  Fatah was (and remains) the dominant political faction within the PA and the PLO.

268.  Tanzim is one of the armed factions within Fatah.

269.  AAMB emerged at the outset of the Second Intifada as an arm of Fatah that could compete with HAMAS and Palestinian Islamic Jihad ("PIJ") as a terror organization with a more Islamic flavor than Fatah's typically nationalist organizations.  AAMB's Islamic leanings allowed Fatah to engage in terrorist attacks but to publicly deny complicity.

270.  AAMB knowingly, willfully, and unlawfully combined, conspired, confederated and agreed to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder, and providing material support to FTOs.

271.  For example, the organization committed numerous terrorist attacks, including several that killed and injured Americans citizens.  Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed twenty-three people and injured approximately one hundred others.  AAMB has also claimed credit for a string of additional attacks that killed more than seventy civilians and wounded more than five hundred others.

272.  In 2001, pursuant to Executive Order 13224, AAMB was designated an SDGT.

273.  On March 21, 2002, the Secretary of State of the United States officially designated AAMB an FTO.

274.  During the relevant period, Fatah maintained an account with Arab Bank in Amman, Jordan and many members of its terror cells (Tanzim, Ahmad Abu al-Rish Brigades,

AAMB) received payments through Arab Bank from Hezbollah (al-Ansar) and/or the Saudi Committee.

275.    For example, Abu al-Jadyan was Fatah's Secretary General in the northern Gaza Strip, a Colonel in the Palestinian Presidential Security Force (Force 17) and one of the founders of AAMB in Gaza.  In May 2001, he directly received a Saudi Committee prisoner payment through Arab Bank.

276.    Zuheir Muhammad As'ad Istiti was a senior operative of AAMB who was involved in a number of terror attacks.  His family received payments from both the Saudi Committee (through Arab Bank's Jenin branch) and the Shahid Foundation, through Arab Bank's accounts for al-Ansar.

277.    Arab Bank knowingly provided financial services to AAMB.  For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative.  In connection with those payments, al-Maqdah instructed Aweis to report back by telephone on the success of his attacks, which included the January 17, 2002 assault on the Hadera banquet hall that resulted in the death of U.S. citizen Aharon Ben-Yisrael Ellis.

278.    Tamer Rasem al-Rimawi was an AAMB operative responsible for a March 28, 2003 terrorist attack.

279.    He later stated that in early 2001 he:

received a telephone call from an officer at the Arab Bank in Ramallah, indicating that I should come to the Bank branch in Ramallah because they had money for me from the Saudi funds as a result of my first injury and hospitalization.  I didn't know the bank officer and had no account at the Arab Bank.  But I went to the bank because everyone knew that if you were injured while participating in operations against Israel you would get money, and if you were killed then your family would get money.  When I went to the bank I met with a bank officer who

gave me a check from the Arab Bank in the amount of $1330.00 US dollars.  I was told the money was because I was injured during an operation throwing stones; I signed the check which was not a check from a charity but actually a check on the account of the Arab Bank, and I was given $1330.00 in US dollars at the Arab Bank.

280.    Numerous other AAMB operatives received payments through Arab Bank, including Umar Abd al-Fatah Hafez Yasin, Abd al-Rahman Muhammad Abu Bakra, Alaa Suliman Hussein Abu Bakra, Sami Jawdat Barbakh, Rami Ismail Ali Alyan and many others.

## C. **Palestinian Islamic Jihad**

281.    PIJ is a primarily radical Islamist terrorist organizations committed to the globalization of Islam through violent "jihad," or holy war.

282.    PIJ is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism.

283.    Executive Order No. 12947, which President Clinton issued on January 23, 1995, designated PIJ an SDT.

284.    On October 8, 1997, PIJ was designated an FTO by the U.S. Government under the AEDPA.  The designation has since been renewed every two years, including in 2003.

285.    In 2001, pursuant to Executive Order 13224, PIJ was designated an SDGT.

286.    PIJ has established numerous front organizations, including:

  i.   Al-Ihsan Charitable Society;

  ii.  Dar al-Huda Society; and

  iii. Islamic An-Naqqa Society for Women, Bethlehem.

287.    Arab Bank knowingly maintained accounts for Al-Ihsan Charitable Society, including Al-Ihsan's branch in Gaza (Account No. 100379-8-500) and its branch in Bethlehem,

51

in USD (Account No. 717520-1-510), Israeli Shekel (Account No. 717520-1-570) and Jordanian Dinar (Account No. 717520-1-500).

288.    On May 4, 2005, the U.S. Government designated Al-Ihsan an SDGT.  According to the press release announcing the designation, "Elehssan cooperated with PIJ to distribute funds to the families of PIJ prisoners and deceased members …. Elehssan maintains lists of PIJ-associated families who are to receive compensation – including the families of PIJ suicide bombers."

289.    Arab Bank also knowingly maintained accounts for Dar al-Huda Society in USD (Account No. 16782/7/510), Israeli Shekel (Account No. 16782/7/570) and Jordanian Dinar (Account No. 16782/7/500).

## Arab Bank's Significant Ties to the Iranian Program in Support of the Martyrs

290.    Like the Saudi Committee, other organizations transferred money in direct support of the families of "martyrs" and prisoners during the Second Intifada in order to encourage Palestinians to continue the violence.  Among these organizations were the Arab Liberation Front ("ALF"), which operated in the Palestinian Territories on behalf of the Iraqi dictator Saddam Hussein, and the Lebanon-based Shahid (or "Martyrs") Foundation, which was funded by Iran and operated in the Palestinian Territories in cooperation with the Gaza-based al-Ansar Society.[6]

291.    The Shahid Foundation in Lebanon was designated as an SDGT by the U.S. Government on July 24, 2007.

292.    At that time, the U.S. Treasury Department noted:

_____

[6] Al-Ansar was designated an "illegal association" by Israel on October 24, 2003.

The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon have also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories.

293.    The Shahid Foundation in Lebanon used the al-Ansar Society to distribute martyr payments on behalf of Iran through its Arab Bank accounts.

294.    On May 15 and 16, 2001, the Palestinian daily *Al-Hayat Al-Jadida* published an announcement signed by al-Ansar that called families of martyrs that resided in the Gaza Strip to arrive at the society's offices (indicating its address in Gaza) in order to receive their money. Families of martyrs from the West Bank were asked to send to a mail box in Gaza copies of official documents, which proved their status as martyrs' families, so that they could receive their money.

295.    On July 1, 2001, *Al-Hayat Al-Jadida* published an announcement signed by al-Ansar calling on the residents of the southern Gaza Strip to come and collect their due payments in al-Ansar's offices in Gaza. Residents of the West Bank, as well as the northern Gaza Strip, were asked to arrive at the Arab Bank branch in which their account was managed in order to collect their funds.

296.    The martyrs' families from the West Bank had to provide documents to collect these payments from Arab Bank, which included the martyrs' identification cards and pictures (if they had it), the beneficiaries' identification card, a copy of the martyrs' death certificate, and a copy of the birth certificate of the martyrs' sons, if they had any.

297.     On its website, al-Ansar also identified its accounts with Arab Bank's Al-Rimal

branch in Gaza as the source of these payments.  The website also expressed al-Ansar's goals

explicitly:

> Al-Ansar opens its doors to the families of martyrs who seek it in order to register
> their martyrs, who, with their noble blood, have watered the pure soil of Palestine,
> drawing thereby the features and portrait of the coming freedom and the coming
> dawn.  Al-Ansar follows their path and shares with their families and their parents
> the grief, the burden and the hope.

298.     On its website, the Shahid Foundation was even more direct.  It published lists of

Palestinian "martyrs" who received support from the foundation.

299.     Its lists were in some ways more detailed than the Saudi Committee's lists (both

those that were published on the Saudi Committee's website and those that were sent to Arab

Bank).  The Shahid Foundation lists included the dates of the martyr's birth and death, as well as

his organizational affiliation (Fatah, HAMAS, or the PIJ, for example) or a statement that the

"martyr" was a civilian who was purportedly not involved with one of the terrorist organizations'

activities.

300.     The Shahid Foundation's web site listing of beneficiaries included the following:

- The January 2002 list identifies "Martyr #1" as Muhammad Abd al-Ghani
  Muhammad Abu Jamus, a member of HAMAS in Gaza.  HAMAS' web site
  confirms Abu Jamus' HAMAS affiliation and confirms his date of death.  In
  addition, the Abu Jamus family received a martyr's payment from the Saudi
  Committee.

- The March 2002 list identifies "Martyr #154" as Muhammad Ahmad Hilis, an Izz
  al-Din al-Qassam Brigades operative in Gaza/Al-Shuja'iya.  HAMAS' website
  confirms this fact, as well as his date of death.  Hilis' father received a martyr's
  payment from the Saudi Committee on June 6, 2002.

- "Martyr #153" on the same list, Bilal Fayez Mustafa Shehada, is also identified as
  an Izz al-Din al-Qassam Brigades operative.  Shehada, a resident of Beit Hanun,
  was killed along with Muhammad Ahmad Hilis in a terrorist attack.  Shehada's
  father received a martyr's payment from the Saudi Committee on June 6, 2002.

301.    The Shahid Foundation, through al-Ansar, also paid numerous Fatah terrorists, including those affiliated with AAMB.  The recipients of those Shahid Foundation payments included Abd al-Karim Umar Abu Na'isa, who committed a terrorist attack in Afula, Israel in November 2001.  Abu Na'isa's family received payments from the Shahid Foundation, the Saudi Committee and the ALF.

302.    Arab Bank's branches played a central role in transferring money to terrorists and their family members on behalf of Iran through the Shahid Foundation and al-Ansar Society.

303.    The activities of al-Ansar were also the target of Israeli counter-terrorism measures in two ways.  First, Israel declared al-Ansar an "unlawful association" on October 25, 2003. Second, Israeli security forces targeted al-Ansar's accounts for seizure when they raided bank branches in Ramallah in 2004 (including Arab Bank).  In fact, on its website, al-Ansar publicly denounced these measures:

> Al-Ansar Charitable Society denounces and condemns the criminal, sinful attacks of insane piracy committed by the forces of the occupation against the Palestinian banks in the city of Ramallah, which robbed the banks' money that included, *inter alia*, the money of the martyrs who are sponsored by the society.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)

304.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

305.    Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

306.    Plaintiffs are nationals of the United States.

307.    HAMAS and AAMB were both FTOs at the time they committed, planned, and authorized the terrorist attacks that injured Plaintiffs.

308.    Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that HAMAS and AAMB raised money internationally, intended to impact the citizens and governments of Israel and the United States, and operated internationally and sought asylum in multiple countries in the Middle East.

309.    Arab Bank knowingly provided substantial assistance to those acts of international terrorism.

310.    As Plaintiffs allege in detail above, Arab Bank provided substantial assistance to HAMAS and AAMB by, among other conduct: (a) transferring significant sums of money to the FTOs, their operatives and their front organizations; (b) maintaining bank accounts for those organizations, their front organizations, and their senior operatives; (c) administering the terrorism insurance programs that incentivized terrorists to undertake their violent attacks; (d) providing HAMAS and AAMB with access to U.S. dollars and the international banking system; (e) providing seeming legitimacy to the FTOs' efforts to raise funds to finance their operations and to compensate terrorists and their family members following terrorist attacks; and

(f) enabling the FTOs to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.

311.    Arab Bank's services and support provided encouragement to would-be terrorists and incentivized their future attacks.  As one of the leading institutions in Jordan and the Middle East, Arab Bank's public support provided moral cover for indefensible acts and persuaded potential terrorists to take violent action.

312.    At the time Arab Bank provided that substantial assistance to HAMAS and AAMB, Arab Bank knew that: (a) the two FTOs were so designated; (b) the two FTOs and their operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Arab Bank was providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attacks that injured Plaintiffs.

313.    Arab Bank also intended that its substantial assistance would facilitate the ability of HAMAS and AAMB to carry out their terrorist attacks against Plaintiffs and other civilians. As a result, Arab Bank recognized that it played an integral role in the FTOs' terrorist activities.

314.    The substantial assistance that Arab Bank provided to HAMAS and AAMB was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

315.    As a direct and proximate result of the substantial, knowing assistance that Arab Bank provided to HAMAS and AAMB, Plaintiffs have suffered significant physical, psychological and emotional injuries.

316.    Arab Bank is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## <u>SECOND CLAIM FOR RELIEF</u>

### <u>PROVIDING MATERIAL SUPPORT TO TERRORISTS<br>IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)</u>

317.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

318.     Plaintiffs assert this claim for Arab Bank's violation of 18 U.S.C. §§ 2333(a) and 2339A.

319.     Plaintiffs are nationals of the United States.

320.     As Plaintiffs allege in detail above, the financial assistance that Arab Bank provided to HAMAS and AAMB played an integral role in the ability of those FTOs to carry out terrorist attacks, including the attacks that injured Plaintiffs.

321.     That financial assistance provided material support to the efforts of HAMAS and AAMB to engage in acts of international terrorism, including the attacks that injured Plaintiffs.

322.     As a result, Arab Bank committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

323.     Specifically, the substantial financial assistance that Arab Bank provided to HAMAS and AAMB constituted acted of international terrorism because that financial assistance: (a) directly endangered human life; (b) violated federal and state laws regarding, among other crimes, money laundering and terror financing; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments; and (d) occurred primarily outside the United States and transcended national

boundaries in that Arab Bank operated internationally in providing its financial assistance to HAMAS and AAMB.

324.     Arab Bank provided its material support to HAMAS and AAMB knowing or intending that the FTOs would utilize the financial assistance that Arab Bank provided in furtherance of their terrorist activities, including the attacks that injured Plaintiffs.

325.     HAMAS and AAMB did rely upon the financial assistance and material support provided by Arab Bank in carrying out the FTOs' terrorist activities.

326.     HAMAS and AAMB engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States.  The FTOs engaged in that illicit conduct pursuant to a joint plan and conspiracy with Arab Bank.

327.     The FTOs' acts of physical violence did cause Plaintiffs serious bodily injuries.

328.     The material support and substantial assistance that Arab Bank provided to HAMAS and AAMB was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Arab Bank provided to HAMAS and AAMB.

329.     As a direct and proximate result of the material support and substantial assistance that Arab Bank knowingly provided to HAMAS and AAMB, Plaintiffs have suffered significant physical, psychological and emotional injuries.

330.     Arab Bank is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## THIRD CLAIM FOR RELIEF

### PROVIDING MATERIAL SUPPORT TO
### FOREIGN TERRORIST ORGANIZATIONS IN
### VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

331.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

332.    Plaintiffs assert this claim for Arab Bank's violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

333.    Plaintiffs are nationals of the United States.

334.    At the time of the attacks that injured Plaintiffs, HAMAS and AAMB were FTOs.

335.    At that time, Arab Bank knew that HAMAS and AAMB were FTOs, that those organizations engaged in terrorist activity, and that they engaged in terrorism.

336.    As Plaintiffs allege in detail above, Arab Bank provided material support to HAMAS and AAMB.

337.    That material support was integral to the ability of HAMAS and AAMB to carry out their terrorist attacks, including the attacks that injured Plaintiffs.

338.    As Plaintiffs allege in detail above, the material support that Arab Bank provided to HAMAS and AAMB constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

339.    The material support that Arab Bank provided to HAMAS and AAMB was a substantial and foreseeable factor in causing Plaintiffs' injuries.

340.    Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Arab Bank provided to HAMAS and AAMB.

341.   As a direct and proximate result of the material support and substantial assistance that Arab Bank knowingly provided to HAMAS and AAMB, Plaintiffs have suffered significant physical, psychological and emotional injuries.

342.   Arab Bank is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a) Accept jurisdiction over this action;

b) Enter judgment against Arab Bank and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial, plus pre- and post-judgment interest at the legal rate;

c) Enter judgment against Arab Bank and in favor of each Plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

d) Enter judgment against Arab Bank and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

e) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: August 17, 2018                    **STONE BONNER & ROCCO LLP**

By:  /s/ James P. Bonner
jbonner@lawsbr.com
1700 Broadway, 41st Floor
New York, NY 10019
(212) 239-4340

61

**HEIDEMAN NUDELMAN & KALIK, PC**
Richard D. Heideman
(*pro hac vice motion to be filed*)
Noel J. Nudelman
Tracy Reichman Kalik
(*pro hac vice motion to be filed*)
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818


**SAYLES WERBNER P.C.**
Mark S. Werbner (*pro hac vice motion to be filed*)
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700


**PERLES LAW FIRM, P.C.**
Steven R. Perles (*pro hac vice motion to be filed*)
Ed Macallister (*pro hac vice motion to be filed*)
1050 Connecticut Ave., NW, Fifth Suite 500
Washington, D.C. 20036
(202) 955-9055


**THE DAVID LAW FIRM, P.C.**
Jonathan David (*pro hac vice motion to be filed*)
301 Congress Avenue, Suite 1910
Austin, Texas 78701-2959

Attorneys for Plaintiffs